of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable. The United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and get their attention for the Court is now sitting. God save the United States and this Honorable Court. Bob, you ready? Yes, Your Honor. Thank you. If it may please the Court, my name is Jay Babb. I'm from the law firm of J. Lewis Kramer and Associates, and I represent the plaintiff in this action, David Christian, III. We've come before you on appeal from a grant of summary judgment by the lower court, a grant of summary judgment on the race discrimination claims brought by Mr. Christian, as well as a claim of civil conspiracy against several individual named defendants in their individual capacities. Your Honors, we believe the plaintiff has presented sufficient evidence to show that there was racial discrimination or to show that there was pretext in this case for the varying race discrimination claims under Title VII. We also believe that there was a failure to promote as well as the incidents involving the reduction in force in this case, which I'll discuss a little further in detail in a moment. As far as the civil conspiracy action goes, we hope to show you through this appeal that a valid cause of action was presented for civil conspiracy, that there were additional acts in furtherance of the conspiracy shown, that the purpose of the conspiracy was to injure Mr. Christian, that there were special damages, and that certainly there was no immunity based on the statute. Going back to the Title VII claims, Your Honors, the force reduction in force being the primary employment action that occurred, we believe that there are several reasons or pieces of evidence that we have presented before the court, circumstantial or otherwise, that help support his claims. One of those being the implausible reasons for the riff or that the reasons given were not honestly held. There was some meetings and circumstances that occurred prior to Ms. Templeton coming in to be the director and being confirmed as the director, I should say, in January of 2011. If I back up, Governor Haley was elected in in 2010. At that time, she was selecting individuals, of course, to fill her cabinet and also to take on director roles within the state. She had a press conference where she announced Ms. Templeton. And during this press conference, or I guess immediately before the press conference, she met with Ms. Templeton and had a discussion with her. And the discussion was about making changes at LLR. When asked how she would characterize it, Governor Haley said corrupt. Ms. Templeton came into the press conference. She proceeded to talk about the changes she was going to make to bring LLR back to the way it was. And I'll stop there to, of course, give a little background on that issue. LLR, Labor Law Enforcement Regulation, of course, handles the professional licensing in the state of South Carolina. There's several boards that are run that actually issue licenses, and LLR is the agency that helps process those licenses and helps support the boards. Prior to 2008, there was not an OLC, Office of Licensure and Compliance. Prior to that, those licensure and compliance duties were purely held at the board level. Now, the personnel that were working for the board were LLR personnel, but they were basically working for the board administrator and the board directly. Due to a variance of problems that we believe were outlined, that wasn't working. There was no oversight. Things were either falling through the cracks, whether intentionally or unintentionally. Licenses were being issued without actually receiving funds in several cases. Certain individuals had licenses that shouldn't have or weren't in compliance anymore. May I ask you a question? Because the history that you're describing, it does seem as though what you might be describing is sort of your average political turf war, right? Where the licensing boards used to get to do their own licensing, and then that was taken away from them for the reasons you're describing and kind of put in this separate thing, and they want it back. And so, I mean, that happens all the time, and it just reads to me as though at least one very plausible explanation for what happened here was like just a good old-fashioned political turf war. And so how do you kind of disentangle that from the claim you're trying to make, that it wasn't about the politics, it wasn't about who gets to be in charge of licensing, it was about race? Absolutely, Your Honor. Certainly, I can't sit here and say there was no political machinations going on with this. I think anyone who's familiar with the government, state government particularly, knows how that can go. You set the bar for yourself. You said implausibility and dishonesty. The honest reason wasn't honest, and the cause wasn't plausible, as Judge Harris asked you. Go ahead. You can see that it was this political-type turf. Certainly. I think you start to see that when you see how OLC, and more particularly the management at OLC, Mr. Christian being the one that was the assistant deputy director over at OLC, was targeted. It began back with this anonymous letter. Now, when this anonymous letter came in, the legislature said, hey, listen, this is not something I would normally pay any attention to. I'd normally throw this in the garbage. But in this instance, he didn't. Instead, it turned into a LAC audit, which resulted in hearings where Adrian Yeomans, African-American former director, was just grilled, I think is the word that was used. The letter itself attacked certainly the agency, but also particularly David Christian and the management there. So it was targeted, not just necessarily OLC, but the management there and David Christian there. So you start to see that. Then, of course, once the election occurred, you start having meetings with Ms. Templeton prior to her coming under confirmation. Well, certainly that can be normal for someone to come in and have meetings. However, those meetings included certain individuals, those individuals being the same legislator that had the issues, Mr. Alvey, Jim Knight, who it's still unclear as to why she would be having the meeting with Jim Knight, because he didn't have a particularly important role there such that she'd be having the meeting. But anyway, he also, in one of the reduction in forces, benefited, because his area, the immigration area, was reduced. But he still retained a high position. And then once you get into the actual reduction in force, they targeted OLC, which has predominantly African American makeup, both in totality, but also in management. And OBS is important here. I think OBS cannot be neglected, because OBS still retained several of the poll groups. They had not been all transferred over. So it should have been included as part of the reduction in force, but it wasn't included. And that's one of the contentions that we have, is that they weren't made a part of the reduction in force, and that competitive area is not chosen by OHR, the Office of Human Resources. That competitive area is chosen by the agency. If some of the boards are still with OBS, some are with LLR, then the competitive area should have included OBS itself. And you want us to decide that? Well, Your Honor, I'm not asking the court to decide a management decision. Sounds like it. Your Honor, but I believe that there's a clear racial impact. That would have been apparent to them at the time. In fact, the documents they have delineated the races of the individuals. Do you make out a disparate impact case here, a pattern of practice here? Do you have that kind of case? Your Honor, we believe that there is a disparate impact case here. You might believe it now, but have you set forth the groundwork and the foundation for any kind of claim to Title VII? Do you think you have? I believe we have, Your Honor. Okay, go ahead. So, Your Honor, and that's another aspect, of course, is the disparate impact of this, or using that statistical evidence to show the disparate treatment as well. Of course, we also have the failure to promote claims where the individuals were pre-selected basically for the positions they were in. They were made interim. Then when it came time to have the actual interviews, Mr. Christian was interviewed one time for three completely different positions with different duties. The scores of the individuals that were already interim were perfect across the board. In fact, there was some finagling going on with some of the numbers where two fours were changed to fives, which may seem like, hey, that might actually help Mr. Christian out. What's interesting is that would put Mr. Christian right above Maurice Smith, who's one of the other interviewees, which we think was done to inhibit him from trying to argue that there was some kind of agenda against him, to say, hey, you were number two. But according to the numbers, he actually wasn't number two, based on what they originally put on there. Nonetheless, we believe that there's some evidence of this pre-selection, evidence that these individuals were already given the job, and all those individuals being Caucasian. There's other evidence we presented where very other white individuals were given preferential treatment after the RIF. That's something else that's not looked at in the procedural analysis done by OHR when there was a grievance. They don't look at what happens afterwards. On April 1st, 2011, that's all they care about, the supposed termination and rehire, which we, of course, believe, however you couch it, whether it's termination, rehire, or demotion, but we believe it was all geared towards a demotion. Nonetheless, we believe that there's that evidence showing that there was the preferential treatment of Caucasians over African-Americans, even at that point. We've listed those out, the Janet Bahlbergers, the Kate Nedevicks, and others. Can I ask you a question about your mosaic theory argument? Is it your understanding that that is the mosaic theory, and the way the Seventh Circuit has labeled it and applied it is different from what we do in the Fourth Circuit? I mean, haven't we already said that you look at all of the evidence together in its totality? Do you understand this to be sort of a distinct kind of analysis? I do, and I think that's kind of nuanced. I think it's taken an approach, and the way we view it is it's taken an approach of looking at the totality of the evidence almost in a direct evidence approach. Not direct evidence, but a direct approach of proof that maybe the evidence itself isn't direct, but there's enough of it that it amounts to that. So it could get rid of the formalities of some of the Title VII McDonnell-Douglas framework. Nonetheless, I think that maybe it isn't totally different than how we approach it now, but maybe it's trying to get the court to put another light on that and really look at the totality of the evidence. You urge us to look at whatever this mosaic is, right? Yes, Your Honor. You know, the Seventh Circuit is known for their eloquence often, but it seems to me that's a hard standard almost because we already use totality to take everything in, but a mosaic, you take everything in, but then at the end it needs to fit and look like something, a piece of art. But we do that. May I quickly respond, Your Honor? Sure. I do agree to an extent with that, Your Honor. I think that the case law tells us that the underlying question is was there racial discrimination, and that's what the mosaic kind of gets at, but it's just, I guess, focusing more on the totality of the circumstances and really that more than the framework itself. Mr. Black, just to ask you, tell me what is your strongest, strongest argument that racial animus or racial consideration motivated the writ, the not promoting and not rehiring? What's your strongest, strongest evidence? Give me 30 seconds to just tell me the strongest thing. Your Honor, I believe that the preferential treatment of the white individuals over the African Americans as far as showing specifically race. You mean post-riff? Post-riff, definitely, and even pre-riff with the individuals being promoted up, shifted around. Our evidence is that they were already, you know, already knew, and we believe the evidence shows that they already had this plan coming in. So if they knew that at the time that they were promoting these individuals, then, you know, they certainly would have given them preferential treatment. I see. So the pre-selection, they were gilding the lily already and say, well, they're already in there now. Do you mean that kind of thing? Yes, Your Honor. I was saying, well, you know, Mr. Christian was already still in his old position at that time. Well, if they already knew what they were going to do, then they were just laying the framework. All right. Mr. Harris, do you have anything else? All right. Thank you so much. Thank you, Your Honors. Mr. Pearson? If you please, Court. Your Honor, my name is John Pearson from Fisher & Phillips in Columbia, South Carolina, and I'm speaking on behalf of the South Carolina Department of Labor Licensing and Regulation. With me today is Molly Craig from Charleston. She's, hopefully we can reserve five minutes for her to speak on behalf of the individual defendants, and Ken Woodington is also here representing the individual defendants. This case is about circumstantial evidence. There's no direct evidence of discrimination in this case. None has been alleged. And what I want to do is talk about how this circuit has treated circumstantial evidence and how the convincing mosaic theory works in the Seventh Circuit and show that what they've alleged is not sufficient under either standard. I'm not going to go into a lot of detail about the facts. I think they're covered very well in the briefs. I will say there were 25 depositions taken in this case, which is a lot of depositions for an individual discharge case. There were thousands of documents supplied. And after looking at all of that, what the plaintiff has come up with is very, very unpersuasive. One thing I would like to note is Ms. Templeton was a new player. She arrived in January of 2011, and much of what the plaintiff complained about happened years or even a year before. So we're looking at her. She's the one who made this decision. The question before was, was it a political problem? And the answer is, yes, it was. This was a highly controversial agency, division. That's admitted. Now, Mr. Christian and Ms. Yeomans, the previous director, felt like if given time it would work, but it wasn't working.  All the members are members of professions. Almost all of them are appointed by the state legislature. They're all connected. When they have a problem, they call the legislature. Ms. Yeomans said it was like having 300 mini-legislators. And so it was a political problem. And it wasn't just the boards and the legislature. There were substantial numbers of complaints from the regulated public about getting applications timely filed, et cetera. Now, we don't have to decide who was right. All we have to decide is that there was a legitimate question, and the employer did what they could. Ms. Templeton did what she could to try to reorganize this particular agency to make it work better. As far as the methodology of the layoff, she conducted five other layoffs the same year, trying to move around different parts of that agency. This was the biggest one, no doubt. But every single one of them used the RIF methodology to move people around. When this RIF occurred, virtually everyone in this department was immediately placed in another department at the same pay. Now, I will freely admit that there were several, like Mr. Christian, who were offered jobs at a lower rate. But he was still in state government. He still had his benefits. He still had his retirement. And he was still capable of moving into other jobs. He went from $70,000 to $30,000? It was a significant reduction. Absolutely. It was a significant reduction in pay at that time. How did a person with that kind of experience in management go so precipitous? Because that was what was available as a result of that RIF. Another person that was referred to is Robbie Boland. Robbie Boland had almost the same type of reduction. He immediately applied for a new job and was turned down. And he kept applying, and eventually he started moving back up. It was a significant reduction. We're not arguing that. But that's the way that the RIF procedure works. And that was a significant reduction. But there's no evidence that it was based on Mr. Christian's race. Now, Mr. Christian thinks that the whole thing was directed at him personally. But when you look at the big picture, that's just not a reasonable assumption. Now, if you look at how circumstantial evidence has been treated in this circuit. Actually, counsel, can I just ask you, while we're talking about the facts, do you want to respond directly to what I understand your colleague to be arguing, which is sort of when you put together the RIF with what happens next, when you look at those facts together, that the white employees did much better as a whole. Well, they did not do much better. When you look at, and this is the problem with so much evidence that's being presented in this case by the plaintiff, is it's not admissible evidence under Rule 56. The plaintiff based his evidence on what happened after the layoff on the testimony of the plaintiff and a witness called Sherry Wilson. And the plaintiff had no first-hand knowledge of what happened to these people. He said it was based on common knowledge in the agency, and when he was asked specifically what happened, he said he had no evidence. When Sherry Wilson was asked the source of her knowledge of what happened to these people after the layoff, she said the rumor was out. That's what she said. Now what we did is we went and pulled their records, their employment registers, and submitted them with affidavits showing exactly when these people moved where. Every one of them was laid off. He originally said Robbie Bowen wasn't even laid off. Well, yes he was. He was laid off. His salary dropped precipitously, and he stayed there through one unsuccessful promotion attempt, and then finally he got a promotion. When she mentioned these folks Nedevick, Burgess, and Flannery, the original allegation, and the ones apparently we're still saying, is that they ended up better off. They did not. They all lost their jobs in the RIF, and they weren't rehired. Two of them were rehired in September of 2011, and one of them wasn't rehired until January of 2012. That's what the records show that we put in evidence. So your response is not that you're not arguing, first there's a RIF, then all the white employees do fine, and that doesn't raise an inference. You're saying that's not what happened. I'm saying that that's not what happened, and it's not a contested issue of fact, because he only has hearsay evidence to oppose the actual records. The question was asked earlier, is the convincing mosaic theory different than what we did here in circuit? It's not in this circuit. Circumstantial evidence obviously has got to be admissible. Opinions that are unsupported are not circumstantial evidence. Hearsay is not circumstantial evidence. Statements by non-decision makers are not circumstantial evidence. Can I follow up on your exchange with Judge Harris? I guess I'm a little bit unclear why, if someone was promoted in January of 2012, why that doesn't count as probative evidence of more advantageous treatment of a non-African American who was in fact RIFed, but then brought back. Maybe I missed part of your explanation. I think that I wasn't very clear on that. In other words, what I'm hearing you say is that you cured the hearsay problem, not the effect of the argument. Well, without the real evidence, without looking at the real evidence, this woman was laid off like everyone else, in April of 2011. She lost her job. She lost her paycheck completely. The only way she got back in that agency was to get online and look at the state jobs available and continue to apply for them until one became available. She didn't get promoted. She just got a job. So the plaintiff's allegation is that she was one of those who actually were promoted immediately? That is their allegation. That is just not the case. I'm sure that they heard that, or I assume they heard that, but a lot of times when the rumors start around these agencies, you've got to actually pull the records and see when she went off the payroll and why, and when she came back on the payroll and why. And we've got firsthand knowledge in there that that's what happened, and that's no evidence of preferential treatment. Except, I guess, again, sort of playing devil's advocate, if the plan all along was to lay off a bunch of folks in early 2011 and then over the next six to nine months bring back certain folks and not bring back certain other folks, isn't that probative? I'm not saying how probative, but it's not specious. It's not probative at all, I don't think. If you look at the plan, under the RIF plan, 35 employees were offered new positions immediately. And of those 35 employees, 24 were African Americans, which is almost the exact percentage of the people who were subject to the RIF. And there's no evidence at all that race played any portion, any role at all in the RIF, none. I mean, it's just... And then we had other people who went out the door completely. I mean, they were basically fired. They were... And they had a preference for rehire, I think, for a year. But they were out the door, everybody, African American and white. And we don't know how many African Americans applied and came back. I assume there were several. And he's pointing to these people saying that, well, they came back immediately, and they did. They had to stay out for months with no paycheck. And that's my point. There's no evidence of race discrimination. I see. Now... I would like to point out a couple of cases very quickly, though. In this circuit, the standard for circumstantial evidence is it's got to reflect directly on alleged discriminatory attitude and bear directly on the contested employment decision. It's not just a possibility. And that's the Brinkley case we cited. It's got to raise a reasonable probability. And that's important. Just if Katherine Templeton met with somebody, that doesn't mean anything unless it raises a probability that something bad happened. We've got a lot of cases in hearsay is not allowable. We've got a lot of hearsay evidence that we've covered in our brief. Opinions that are not supported by specific facts aren't allowable. And if you apply the convincing mosaic theory, the cases cited in the Hobgood case set out that it's not a new theory. Sylvester versus SOS says there's no intention to create a new theory. Counsel, can you take a moment and just respond to their allegation that folks are now on the sort of three heads, if you will, of people like Cook and people like that, that he was treated differently than those people were in his preselection. Can you address that? I'm the one to look at those. That triangulate there, you can see a clear, targeted approach. You talk about, well, we know he's dropped his salary and those kind of things, but he didn't get a job. He didn't get a nice-paying job that he had. Well, what happened was that Randy Bryant, who he had at OBS, was fired. He's a white guy. He was fired. And he was at the same level that Mr. Christian was. And when he was fired, someone stepped in his place temporarily. David Christian couldn't do that because he was still running OCS. So the person that stepped in was Charlie Ida. But he would have been otherwise qualified for that job had he not been busy running what he normally runs, correct? We do not know at that point. But this was not a permanent employment. This was not permanent employment. It was just, Charlie, handle this for the time being. Right. Now, Mark Dorman had been doing the job that he ultimately got for two years because the person who was the titular incumbent, I'm out of time, can I finish answering? Yes. The person who was the titular incumbent, Ryan Alvey, was actually serving temporarily as the assistant director. He had been doing that job for two years. And the other job was the one with Mr. Cook. Mr. Cook. Drug diversion. What? The drug diversion. The drug diversion. And he had been running those investigators in a different capacity for a good while. And I might add with that that Mr. Christian had no experience in running investigations. But I know they would try hard for him to get a job that would be commensurate to his normal pay and work, didn't they? Wouldn't they try hard to do it? Since, as you said, a lot of people were staying on, 35 of the people were hired right away, wouldn't you try to respect the dignity and the pay in terms of bail? Well, I think that the goal here was not to push him out. The goal here was to conduct a RIF according to the procedures of the RIF and allow people to move as jobs that they were the best qualified for came available. That was the goal here. All right. Judge Anderson? Thank you so much. Appreciate it. Can we have a few minutes for our individual defendants to argue? Yes, sure. That's what I said. Thank you very much. We're going to hear from Ms. Craig, right? Yes, sir. May it please the Court. My name is Molly Craig. I represent Katherine Templeton, but I'll be speaking on behalf of all of the five individually named defendants. We respectfully request that this Court affirm the district court's finding of summary judgment on the South Carolina state law claim of civil conspiracy. The appellant simply cannot establish civil conspiracy against any of the individually named defendants in this case. The appellant's allegations of civil conspiracy are speculative, they're conclusory, and they fail to establish the elements necessary to support a civil conspiracy claim. The district court correctly adopted the magistrate judge's report and recommendation and correctly granted summary judgment for four main reasons, and I'll set those four reasons out. First reason is the appellant failed to show any additional acts in furtherance of the conspiracy, which would be separate and apart from his other causes of action, sufficient to constitute a conspiracy. That's the first one. The second, because the appellant has not identified or presented evidence of special damages, which is required in a civil conspiracy case. The third reason is the appellant can provide no evidence of the individual defendants acting outside the scope of their official duty. Therefore, they are immune from suit based on the South Carolina General Assembly ratification of a proviso in the state budget providing governmental employees are statutorily immune from civil conspiracy claims related to claims arising from employment actions. And then finally, the fourth reason is the appellant has presented no evidence showing that the primary purpose in dissolving the OLC was to injure him. As this court is well aware, in order to prove a civil conspiracy, it must be a combination of two or more persons joining for the purpose of injuring the plaintiff and causing special damages. And now to address each of those four reasons in a little bit more detail with regard to the first reason as to why summary judgment was appropriate by the district court. The magistrate judge stated in her recommendation of the district court and the district court correctly adopted that the appellant cites identical evidence for his racial discrimination and failure to promote claims against LLR as he does to support the civil conspiracy claim against individual defendants. And a civil conspiracy claim must allege additional facts in furtherance of the conspiracy rather than reallege the other claims, which is exactly what we have in this case. The appellant, in response, invited the court to review the circumstantial evidence set forth in his Title VII claim and his objections to the magistrate's report and recommendation. And we would, in response to that position, we would refer to United States v. Bales, which says arguments incorporated by reference need not be considered on appeal. With regard to our second reason that the summary judgment, it was granted properly for the individual defendants, the fact that Christian... I don't mean to slow you down, but I'm just... I find it interesting as a matter of just legal reasoning. A fact can do work in support of two or more theories, legal theories, right? A single fact is not limited to one legal theory. In order to prove the civil conspiracy, there must be additional facts that are separate and apart from the Title VII. Why is that? Under the civil conspiracy, the three elements that must be met in a civil conspiracy claim. And in this case, there are no additional facts. The exact same facts that the appellant relies on to support the Title VII he is relying upon to support the civil conspiracy. But that's just one of four. I understand that. But my point simply is that the fact may not be probative of the Title VII claim or insufficiently probative. And it can be insufficiently probative of a conspiracy claim. But I don't understand the law to say, just because a fact may or may not be probative of one legal theory, you can't consider that same fact or that same evidence in support of an alternative or parallel legal theory. Yes, Your Honor. I see that my time has almost expired. May I respond to your last question? With regard to your question, I would refer, Your Honor, to the Hackwork v. Graywood-Hammett case, which states that a civil conspiracy claim must allege additional facts in furtherance of a conspiracy rather than reallege other claims. Thank you, Your Honors. Thank you. Mr. Baird, you have reserved some time. Thank you, Your Honors. I want to go ahead and address the civil conspiracy since that's the last we heard before the court. I'm not sure that's a compelling reason. It's in my mind. I'll just say it very quickly, Your Honor. While it's fresh. The idea of, and I think you hit the nail on the head, the idea of not being able to use any fact in civil conspiracy that was used elsewhere is, in my view, not the law. That's a Todd case. She's not saying you can't use any facts that you use in your Title VII claim to prove your conspiracy claim. She's just saying you need something more on the conspiracy side. You can reuse all the same facts, but then you have to add something. And I would have thought that was just sort of a state law judgment. They don't want people always to throw in a conspiracy claim on top of everything else. They don't. They don't want just a duplicative claim reworded as a civil conspiracy. But this started the conspiracy before Ms. Templeton even came in. Certainly, you know, do we allege that she was part of the conspiracy back when the anonymous letter first came in? No. But the law says that you can join the conspiracy. And that's what we've alleged that she did. That once she got pulled in, once she had the meeting with Governor Haley. Who were the conspirators before Ms. Templeton joined? Well, believe it, it started with, of course, Representative Sandifer. And at that time, someone. A defendant in this case? He's not a defendant in this case. I didn't think so. Go ahead. Okay. Although the case law tells us that the conspirators are jointly and severally liable. That's true. They do not have to be all named in the conspiracy. It's just a query. You're absolutely right. You don't. But, Your Honor. Anybody else? Yes, sir. Sandifer and there was others, including some of the board. No, no, no. Don't give me that broad. Tell us who they were. Okay. Well, Mr. Creech would have been one of those individuals. There was a letter that he had written scathing against my client. And that happened to be the only or one of two of the only board members that Ms. Templeton happened to meet with prior to actually coming in, from that December to January time period. And I think who she didn't meet with was... Are you saying this letter was full of dishonest assertions? It was. It actually said that his testimony or what he has to say basically shouldn't be given credence or wasn't necessarily honest. I don't remember the exact verbiage, but I believe it's in the record. And so, you know, board members such as him. That's the only way I can specifically identify to you. I know the pharmacy board and some of the other boards were kind of in controversy. But the conspiracy had already started. So the additional acts and furtherments, we've already talked about. Certainly there's some overlap because, you know, there just is. Once it enters the employment setting, once she comes in, once the reduction of force happens, but there are additional facts. So the die is cast against you, the client. And what's on the die? RIF, promoting him, or what is it? Removing the management, and we've started the black management, but removing the management from LLR and ALC. Now, Ms. Yeomans is already going out. Election was won by Governor Haley. She's going to appoint who she's going to appoint. However, David Christian and the other band 5s and up, not necessarily all of them because there's some unique positions that have higher bands, but basically the management there, support admissions, were going to be gone. And, you know, the goal was, according to Ms. Tipton in her testimony, the goal was a reorganization. The RIF was a vehicle. So whether it had been done through a RIF or through some other method. Now, after meetings with OHR, the RIFs use. Now, what ties any of that to race other than the race of the people involved? Well, I believe that the individuals that were targeted, of course, were African Americans. There's some other evidence. Well, but isn't it correct to say they happened to be African Americans? Were you saying they were targeted because they were African Americans? We believe they were targeted because they were African Americans. Okay, you believe that, but where's the evidence to support that belief? Five hundredths. Okay. That it believed a jury could find that. Certainly. There's the preferential treatment that we discussed earlier of several of the white individuals, which I'd love to jump into in just a second. But going on further than that, also, the preselection, other things that we talked about. But in addition to that, there was some racial comments made by some of the individuals. Some of it, certainly, individuals, the witnesses couldn't necessarily pin down who said it or what, but I think it showed the racial atmosphere there at LOR. That being the comment about the N-word being used. Also, the comment from Defendant Cook that he was going to make Miss Wilson, who was one of the plaintiffs in the three different cases that were originally brought, he was going to make her do the N-word dance. So, we believe there's some evidence out there of those kind of comments being made that are racial in nature. Mr. Cook, the individual that they have distanced themselves far from, but according to his own testimony and even the video that was shown, he's the eyes and ears of Governor Haley. He's basically the inside person, feeding inside information, if you will. Now, of course, he denied it. Then when I presented the video to him, he said, oh, okay, well, I did say that, but I don't know why I said that. So, anyway, we believe there's other evidence there to show between the preferential treatment and the discriminatory remarks that help support that. And I do want to talk about the preferential treatment briefly. Mr. Boland's interesting because when I deposed him, I asked him about the organizational chart and who he was supposed to report to. Did you ever report to her post-riff? No. He basically indicated that he was out maybe a month and a half before his salary went right back where it was. So, the idea that he just happened to get another job, we believe, is not supported by the facts. Also, Mr. Boland was the one that was told by, I believe, Mr. Alvey to Mr. Ido, Robbie Boland will be crucial in keeping the ball rolling. Not David Christian, not anyone else, but Robbie Boland. And that was immediately post-riff. Counselor, can I ask you a question about sort of post-riff, the way different employees fared? Have you sort of pulled together that info? I mean, where is that in the record? Is there, do you make this, is there, what we're looking for, right, is some kind of statistical comparison. And then after this percent of African-American people landed on their feet in commensurate positions and this percent of white employees did. But I don't see that in your evidence. Your Honor, I think part of the confusion lies in that there was three cases that we had been heavily litigating and that some of the evidence we talked about post-riff that occurred was actually positions that maybe Ms. Wilson had applied for and didn't get even though she was better qualified. Or Ms. Betty Gray didn't get because of that. Now, while that may not be a failure to promote for my client in that instance, it certainly shows disparate treatment between African-Americans and whites. But do you see what I'm saying? At least from my perspective when I look at this, it all just looks very anecdotal. Like there's this woman and this woman. But is there something in here I'm missing where this is all pulled together and I can find the numbers? Like here's the percentage and here's the point of comparison percentage. Where is that? And isn't that sort of your burden to pull that together? I can't say that we have the percentages for post-riff treatment. What I can say is that we've tried to give the examples of the white individuals that were part of the reduction in force. What examples? I don't mean to. Well, Ms. Nedevick, for example, the one that came back I think in January. Well, there was also African-Americans that were released as part of the reduction in force and not given another job. But they weren't necessarily given the same preferential treatment. I believe we've referenced those in the memorandum as well. So it's not just that, hey, she got a job post-riff, but that it was African-Americans that didn't get the same job. If it was a couple months later, they still got preferential treatment. They used the reduction in force as the vehicle to get rid of everyone, put them all down to band four. And what's interesting about that is that there was already a large contingent of individuals that band four. So certainly it didn't necessarily affect those. But it was the management that got affected so heavily, and the management in OBS that didn't get affected as heavily, even though they still managed some of the boards, OLC managed some of the boards. It was in flux. And certainly they benefited from not being included in the reduction in force. What was the percentage of whites in that sector? It was a majority more. I don't know the exact percentage. See, that's why I asked the question, have you really made out a case of patent practices? You'd expect a continuum from you saying, okay, this is what the percentage was before, and this is what happened to this. He's been an African-American, and when the dust cleared, this is the impact. We could visually see quantitative, you know, not a quality question, but a quantitative analysis of this is the result. And that would be laid out and that kind of thing. That's why I was wondering, you said you had, but that's one of the problems. You should know, for example. Because I think the council said there were 35 people who got jobs immediately, 24 of whom were African-American. How does that compare to 68% in your quick math in your head? Pretty good. Your Honor. I'm sorry, repeat the question. How does it compare in terms of that number, 68% and then 24 out of 35? Well, Your Honor. Is that pretty close? I believe so. Yeah. Okay. But that's why we, you know, included statistics for the entire OLC, showing that it was the one that was targeted and not OBS. And, of course, the management record says that there's a majority of Caucasian management there. You know, Mr. Ido, who did not have experience, or not nearly as much as Mr. Christian in that position, was made the person that was over OBS. Again, OBS being the white management there being protected, and let's just use the RIF as the vehicle. Because if we use a RIF and RIF the entire thing, then they can't question, through the grievance, why we selected the competitive area. They can't question what we do after, because there's a termination and immediate rehire three days later. Certainly there were some individuals, because of retention points, which is required by state law when they have the RIF plan, that those individuals didn't have a job. But the majority of the individuals that did get the job, or excuse me, all of the management that didn't get a job, or did get a job, got a Band 4 job. Drastically reduced pay. I'll take this at that. We'll come down, we'll counsel, and then proceed to our next case.
judges: Roger L. Gregory, Pamela A. Harris, Andre M. Davis